# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### December 15, 2011 Session

## SIGNATURE DESIGNS GROUP, LLC
### v.
## WAYNE RAMKO AND DONNA RAMKO

**An Appeal from the Chancery Court for Rutherford County**
**No. 08-0582CV      Robert E. Corlew, III, Chancellor**

_____

**No. M2011-01086-COA-R3-CV - Filed June 29, 2012**

_____

This case involves an alleged breach of a construction contract. The plaintiff contractor entered into a fixed priced contract to build a custom home for the defendant homeowners. During the construction, the contractor told the homeowners that the project was under budget, and that they could apply the cushion in the budget toward upgrades. Many upgrades and additions outside the scope of the original contract were made. The project ended up over budget, and the homeowners refused to pay more than the fixed price of the contract. The contractor filed this lawsuit, alleging breach of contract. The homeowners counterclaimed for breach of contract, violation of the Tennessee Consumer Protection Act, and fraudulent and/or negligent misrepresentation. After a bench trial, the trial court awarded the contractor some of the upgrade costs and dismissed the homeowners' counterclaims. The homeowners now appeal. We reverse the award for the cost of the upgrades and remand for specific findings as to each upgrade or addition. In all other respects, the trial court's order is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is
Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the Opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

G. Sumner R. Bouldin, Jr., Murfreesboro, Tennessee, for the Defendant/Appellants Wayne Ramko and Donna Ramko

Mary Beth Hagan, Murfreesboro, Tennessee, for the Plaintiff/Appellee Signature Designs Group, LLC

## OPINION

### FACTS AND PROCEEDINGS BELOW

Plaintiff/Appellee Signature Designs Group, LLC ("SDG"), is a residential home contractor. Defendant/Appellants Wayne Ramko and his wife, Donna Ramko (collectively, "the Ramkos"), approached SDG to have a custom home built. The Ramkos worked with SDG representative Kenneth Cheng ("Mr. Cheng") to reach an agreement. He remained their primary contact while the home was being built.

On June 15, 2007,[1] SDG and the Ramkos entered into a Custom Home Agreement ("Agreement"), a contract prepared by SDG, for SDG to build the Ramkos a home on a lot on Ridgebend Drive in Murfreesboro, Rutherford County, Tennessee.[2] The Agreement provided that the home would be built for a fixed priced of $320,000, which would include a $34,000 builder's service fee payable in three installments.[3] The Agreement was a "fixed price" contract.[4]

SDG also provided the Ramkos a list that described the standard materials used by SDG in its homes. This list was incorporated by reference into the Agreement. The Agreement stated that any requests for changes or alterations to the residence ("change orders") would be "set forth in writing and delivered to Builder."

As the Ramkos' home was being built, SDG made several additions to the project and upgraded some materials used in the project, either at the suggestion of Mr. Cheng or at the

---

[1]The contract actually bears two dates. The June 15, 2007 date is the date on which the Ramkos agreed to hire SDG to build their home. On July 10, 2007, the lender's alterations were made and the construction loan was closed.

[2]The lot was purchased from a third party prior to the parties entering into the construction contract.

[3]The contract initially had a total purchase price of $390,000, which included $70,000 for the purchase of the lot. At the lender's request, this was crossed out and the fixed price of the contract was changed to $320,000, excluding the amount for the lot.

[4]Generally, a construction contract is either a "fixed price" contract or a "cost plus" contract. In a "fixed price" contract, the contractor is entitled only to the "fixed price" provided in the contract so long as the materials used and tasks performed are within the scope of the Agreement. Thus, the contractor's profit equals the "fixed price" minus the cost of construction. A "cost plus" contract, however, is based on a builder's actual costs, and the amount paid by the owner is "a fixed fee or a percentage added to the actual cost incurred." *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 221 (Tenn. Ct. App. 2009) (quoting Black's Law Dictionary Abridged (7th ed. 2000)).

request of the Ramkos. Despite the contractual provision requiring all change orders to be in writing, these modifications were not reduced to writing. The circumstances surrounding these changes and the parties' statements to each other about the changes are the subject of much dispute in this case. It is undisputed that, at the beginning of the project, Mr. Cheng told the Ramkos that the project had started out under budget, and that they had a "cushion" that they could apply toward upgrades. According to the Ramkos, Mr. Cheng encouraged upgrades throughout the project, assuring the Ramkos that they had a $20,000 cushion with which to work. The Ramkos claim that they repeatedly cautioned Mr. Cheng that the project needed to stay within the original budget, and that Mr. Cheng responded with assurances that the changes were within his budget and would not result in any extra expense to the Ramkos over the agreed-upon fixed price. The record shows that the Ramkos purchased many items for the home themselves and that they performed some of the work; they claim that they did this in order to make sure that they stayed within the budget. For example, Mr. Ramko purchased and laid tile in the house, and he purchased a foldout ironing board, installed it, and did the necessary electrical wiring. The Ramkos sought reimbursement from SDG for some of the materials they purchased themselves.

According to Mr. Cheng, however, the Ramkos requested substantial upgrades throughout the project, and they assured Mr. Cheng that they understood that they were responsible for all upgrades that were not contemplated in the original contract. Mr. Cheng identified at least eighteen upgrades requested by the Ramkos that were not contemplated in the $320,000 fixed-amount figure in the Agreement. Mr. Cheng conceded that some of the upgrades requested by the Ramkos were suggested by him, but he noted that the Ramkos were free to reject his suggestions.

Mr. Cheng and the Ramkos met periodically throughout the project, approximately every two weeks, to discuss the progress and planning of the construction. Mr. Cheng maintained an internal spreadsheet to keep track of the amounts paid for the different elements of the project. The spreadsheets included the estimated cost of each item; the actual cost of each item was added to the spreadsheets as purchases were made. At their periodic meetings, Mr. Cheng gave the Ramkos copies of the spreadsheets. On a September 2007 spreadsheet, entered into evidence, the total estimated cost to build the home added up to approximately $298,000, though this total amount did not appear on the spreadsheet. Notably, the $34,000 builder's fee was not included in the estimated costs on the spreadsheet. Therefore, the total of the projected cost of the house on the spreadsheet plus the builder's fee exceeded the Agreement's fixed price of $320,000 by several thousand dollars.

In December 2007, as the project neared completion, Mr. Ramko noticed that the spreadsheet Mr. Cheng had furnished him did not include the builder's fee as one of the estimated costs. Once Mr. Ramko added up the actual costs of the items listed on the spreadsheet and then

added the builder's fee to it, he realized that the total exceeded the fixed contract price.[5] At his next meeting with Mr. Cheng, Mr. Ramko told Mr. Cheng about his observation and expressed concern that the project was over budget. By the time of their next meeting two weeks later, Mr. Cheng's new spreadsheet included the builder's fee in the estimated costs, and the estimated cost for some of the line items had been reduced so that the total estimated cost of the house on the spreadsheet was still roughly within the agreed price of $320,000, despite the addition of the $34,000 builder's fee.[6]

By January 2008, the house was substantially complete. On January 17, 2008, the Ramkos received a certificate of occupancy and moved into the home. In order to issue the final draw of $32,000 on the construction loan, the Ramkos' lender required the parties to execute an Affidavit of Completion. This affidavit represented that the project was complete, that all bills related to construction had been paid, and that the proceeds SDG wished to receive from the lender were the final proceeds from the construction loan. All parties signed the affidavit, and the $32,000 draw was paid to SDG. Mr. Cheng also signed a General Contractor's Lien Waiver Affidavit, waiving any lien on the home to which he or SDG would have otherwise been entitled. In total, SDG received virtually all of the $320,000 from the Ramkos' construction loan.[7]

Subsequently, Mr. Cheng approached the Ramkos and told them that they still owed SDG funds for the upgrades that were not contemplated in the original contract. Mr. Ramko testified that Mr. Cheng requested that the Ramkos pay $16,000 stemming from overages related to the upgrades. Mr. Cheng later revised his claim, asserting that the Ramkos owed SDG $34,000, the full amount of the builder's fee. The Ramkos refused to pay SDG the amounts requested. They took the position that, if the project was over budget, it was due to Mr. Cheng's mistake and not their responsibility.

On April 25, 2008, SDG filed this lawsuit in the Chancery Court of Rutherford County, Tennessee, against the Ramkos. In the lawsuit, SDG alleged breach of the parties' Agreement and claimed that the Ramkos owed it $34,000, the full amount of the builder's

---

[5]At that time, the builder's fee had not been paid in three separate payments as contemplated under the Agreement. Mr. Ramko testified that he encouraged Mr. Cheng to take his fee periodically, but Mr. Cheng responded by saying that he would defer payment of the fee until the end of the project in order to save the Ramkos construction loan interest.

[6]The spreadsheet lists the total of the estimated costs as "$311,954.33." This appears to be inaccurate, however, because the painting estimate of $9,502 was omitted from this total. When the painting cost is added in, the estimated costs total $321,456.33.

[7]The record reflects that SDG was paid $319,806.67 from the construction loan.

fee. In the alternative, SDG asserted claims based on unjust enrichment and/or *quantum meruit*. SDG alleged that it designed the home for the Ramkos "on a cost-plus basis," indicating that the Ramkos had agreed to pay the cost of construction plus the $34,000 builder's fee.

In November 2008, the Ramkos filed an answer and counterclaim. They denied owing SDG the $34,000 builder's fee. In their counterclaim, the Ramkos alleged that SDG (1) owed them the difference between the cost of the lot ($65,263) and the budgeted amount ($70,000) (Count 1), (2) breached the express warranty in the Agreement and the implied warranty of habitability (Counts 2 and 3), (3) violated the Tennessee Consumer Protection Act ("TCPA"), Tennessee Code Annotated § 47-18-104 *et seq.*, by making false representations regarding workmanship and project cost (Count 4), and (4) was liable under a theory of negligent and/or intentional misrepresentation for falsely representing to the Ramkos that the house would be constructed in a good and workmanlike manner, and for assuring the Ramkos that the agreed-upon price of $320,000 would not be exceeded (Counts 5 and 6).

On June 29, 2010, SDG filed a motion to amend its complaint to allege that the Agreement between the parties was a fixed-price contract. The motion to amend explained that any reference to a "cost-plus contract in the [original] complaint is a scrivener's error." SDG also sought to amend its claim for damages to seek "damages in an amount equal to the contract price plus upward adjustments for the changed scope of the project less payments made to SDG," which totaled an amount of "less than $39,000, plus prejudgment interest and costs." The motion to amend was granted pursuant to an agreement of the parties.

On July 13, 2010, the trial court conducted a bench trial. The primary witnesses were Mr. Cheng and the Ramkos. All testified about the course of their dealing during the construction project.

In his testimony, Mr. Cheng said that, in the beginning of the project, the Ramkos forewarned him that they would be on a tight budget. Mr. Cheng claimed, however, that the Ramkos told him that they had "savings and they can pay for the extra [upgrades] . . . . [T]hey said they have extra money to pay for extras if they pick out extras. . . . Outside of the standard. That's what they were referring to. They have the cash to pay for outside of the standard." Thus, Mr. Cheng indicated that the Ramkos were informed when a request constituted an upgrade from the standard contract, and that the Ramkos understood that the upgrades would be an additional cost outside the $320,000 fixed price. Mr. Cheng also acknowledged, however, that he told the Ramkos in the beginning of the project that his estimated cost was under budget, and that they could request some upgrades at no cost because of this "cushion."

Mr. Cheng testified about several items for which the Ramkos requested additions or upgrades from the "standard" under the contract. Through the testimony of Mr. Cheng, SDG submitted Exhibit 10, prepared by Mr. Cheng for the trial, which itemized the bases of SDG's claim. Exhibit 10 listed each addition made to the house and each item that was upgraded, and it included the amount of damages SDG was seeking for each upgrade. It attached receipts for most items. The list included extra costs for the front door, brick and mortar, brick low wall on outside, decorative roof finials, gutter guard, light post, ironing board, hood fan, deep fryer, expedited move-in, intercom/surround sound/security system, shower glass window, water line relocation, relocate laundry piping and sink, pot filler, water softener, custom built-ins, wood closets instead of wire, hinges, thirteen paint colors, fire logs, and decorative concrete upgrade. SDG claimed that all of these upgrades/additions totaled $18,671.93.

Mr. Cheng acknowledged that the Ramkos purchased some items for the home and that they completed some of the work themselves. Mr. Cheng testified that he reimbursed the Ramkos $40,000 from the construction loan proceeds for the items that they purchased; he said that he paid the Ramkos $10,000 in early October 2007, $20,000 in late October 2007, and a final amount of $10,000 in January 2008. Mr. Cheng added that, although he paid the Ramkos $40,000 for work they performed on the kitchen, flooring, and other things, he had to pay third parties an additional $15,999.68 in extra costs for items not contemplated in the original Agreement. Mr. Cheng also asserted that the Ramkos owed SDG $3,830 for the cost of building permits, per an explicit provision in the parties' Agreement.

Mr. Cheng testified that SDG received $319,806.67 in construction loan proceeds. Thus, SDG sought the contract price ($320,000), plus extra costs ($34,670.61), building permit costs ($3,830), and prejudgment interest ($4,387.45), less the amount that SDG had received from the construction loan ($319,806.67). The total amount of damages the Ramkos owed, Mr. Cheng claimed, equaled $43,081.39.

When the project was substantially complete, Mr. Cheng asserted, the Ramkos loved their new home. Toward the end of the project, however, Mr. Cheng "realized the project ha[d] exceeded the budget amount." Mr. Cheng claimed that the Ramkos assured him that SDG would be paid for all of the overages after the Ramkos sold their previous home. Therefore, based on the Ramkos' assurance, Mr. Cheng forfeited his lien rights and executed the lender's Affidavit of Completion, stating that no amounts were left due and owing on construction, so that he could obtain the final 10% of the construction loan proceeds to finish the house.

-6-

Mr. Cheng claimed that, after SDG filed the lawsuit, SDG returned to the Ramkos' home to fix items they were unhappy about. He was unaware of any claimed defect that remained unaddressed.

On cross examination, Mr. Cheng was questioned at length about the spreadsheets and the estimated cost amounts for various listed items. When Mr. Cheng was asked why the builder's fee was not included in the September 2007 spreadsheet, he responded that he was not sure. Mr. Cheng insisted that the spreadsheets were generated only for SDG's internal use so that he could keep track of SDG's spending as the construction progressed. Mr. Cheng described the spreadsheet as a "live" document that changed as the project progressed. He explained that he provided the spreadsheets to the Ramkos so that they could see how the project was progressing. Mr. Cheng could not explain why the December 2007 spreadsheet included the $34,000 builder's fee but the September 2007 spreadsheet did not, and he did not explain why the estimated cost for some items were reduced on the December 2007 spreadsheet. He agreed that there was no reason for the *estimated* costs to change from spreadsheet to spreadsheet.

Mr. Ramko also testified at trial. Mr. Ramko said that he consistently cautioned Mr. Cheng that the Ramkos could not exceed the contract amount of $320,000, because the lender would not approve additional funds for construction of the home. Mr. Ramko acknowledged that he requested some upgrades from what was contemplated in the original contract. He claimed, however, that Mr. Cheng assured him that each upgrade was within the $20,000 "cushion" that was built into the original estimate, and that there would be no extra charges for the upgrades. For example, Mr. Ramko testified that he was aware that adding stonework to the home was an upgrade, but he said that this was offset by money saved in other areas to ensure that the total cost of the project would not exceed the $320,000 fixed price. Mr. Ramko stated that, along the way, Mr. Cheng explained to him where they stood on the budget by referring to the spreadsheets. He said that Mr. Cheng told him that if they saved money on the cost of one item, that saving could be applied to upgrade another item. Mr. Ramko testified that Mr. Cheng "expressed if we're under here on one place, we can go over a little bit here. If you decide that you want something else, we have to sacrifice another thing. But he said we were 20,000 under budget already out of the gate, so there was a big cushion." Mr. Ramko said that he made it clear that the Ramkos' "goal at the end [was] to be under budget," and that he and Mr. Cheng had "regular conversations about overs and unders."

Mr. Ramko testified that, in fact, Mr. Cheng encouraged the Ramkos to upgrade many items in the house, telling them he planned to later bring prospective clients into the Ramkos' home to show them the quality of SDG's work. Mr. Ramko cited as an example an upgraded intercom/surround sound system with a cost of an extra $5,000. Mr. Ramko said that the

Ramkos were initially not inclined to purchase this upgrade, but Mr. Cheng convinced him that such an amenity was needed, given the caliber of the Ramkos' new home. Mr. Ramko testified that Mr. Cheng said: "I'm the professional, let me do my job." All the while, Mr. Ramko stated, Mr. Cheng continued to assure him that the project was still under budget.

Mr. Ramko said that he realized in December 2007 that the project might be over budget when he noticed that Mr. Cheng had not included his builder's fee in SDG's spreadsheets up to that point. Mr. Ramko testified that when he pointed this out to Mr. Cheng, he got no response. At that point, Mr. Ramko said, he asked Mr. Cheng to put an "over and under" column in the next spreadsheet to show whether the actual cost of each item was over or under the budgeted amount for that item. Mr. Ramko claimed that he told Mr. Cheng that he did not fully understand SDG's spreadsheet, and that adding the "over/under" column would help him understand it. About a week later, Mr. Ramko said, Mr. Cheng brought him a new spreadsheet that included the $34,000 builder's fee as well as an over-and-under column. On this new spreadsheet, some of the estimated cost of individual items had been reduced so that the total budgeted cost still came to approximately $320,000. This new spreadsheet, Mr. Ramko stated, caused him to suspect more strongly that the project would end up coming in over budget.

To save costs on the construction of the home, Mr. Ramko testified, he and his wife bought some items themselves and did some of their own work. He claimed that the $40,000 the Ramkos received from the overall construction budget for reimbursement did not cover all of the cost of the items the Ramkos purchased for the project. Mr. Ramko testified about each of the upgrades on Exhibit 10 and explained that many items were upgraded after Mr. Cheng urged the Ramkos to do so, assuring them that the project was still under budget and that they would not be charged for the upgrades.

After they moved into the new house, Mr. Ramko stated, Mr. Cheng visited him and told him that the Ramkos owed SDG $16,000. Mr. Ramko said that this was "exactly what [he] didn't want to have happen." Mr. Ramko acknowledged that, since that time, Mr. Cheng had fixed many, but not all, of the alleged defects in SDG's workmanship on the home. As to some of the repairs, Mr. Ramko contacted some of the subcontractors on his own.

Mrs. Ramko testified as well. She described things in the house that needed repair after they moved in. When asked about requested upgrades, Mrs. Ramko said that she was told that there was money in the budget to cover them. As she understood the Agreement, Mrs. Ramko and her husband could choose upgraded items for the home so long as the cost of the upgrade was offset by savings elsewhere. She testified: "We were not to go over [$320,000]." Mrs. Ramko corroborated Mr. Ramko's testimony that Mr. Cheng told them that they had a "cushion" in the budget for some upgrades.

In his rebuttal testimony, Mr. Cheng admitted that at the beginning of the project he told the Ramkos the construction was under budget. He conceded that he continued to say this to the Ramkos until December 2007. However, Mr. Cheng denied telling the Ramkos specifically that they were $20,000 under budget; he said: "I never [told] them a fixed number that was under." Mr. Cheng denied that he "urged" the Ramkos to make upgrades to the house, but allowed that he did "suggest" options to them.

The Ramkos also offered testimony by a contractor who performed repairs on the Ramkos' home, Randy Clark ("Mr. Clark"). Mr. Clark testified that, in April 2008, he was asked to estimate the cost of repairing sheetrock and other repairs that were necessitated by SDG's poor workmanship. Mr. Clark estimated that these repairs would cost $28,000. He acknowledged that $15,000 of the total $28,000 estimate was for refinishing the hardwood floors, and conceded that he did not have expertise in refinishing hardwood flooring. Mr. Clark testified that he performed some of the repairs included in his estimate, such as repairing the ceiling in the foyer, sanding and repainting the entertainment center, and repairing sheetrock. This concluded the proof at trial, and the trial court then took the matter under advisement.

On August 25, 2010, the trial court entered a final order and memorandum opinion, holding in favor of SDG on a portion of its breach of contract claim. The trial court noted that, by the time of the trial court's order, the parties were in agreement that the home was generally within the contract specifications, and that only minor complaints remained with respect to the quality of the workmanship. The trial court observed that the Ramkos performed some work on the home with the consent of SDG, and that none of the modifications to the contract were reduced to writing. Instead, all of the modifications were accomplished either at the oral direction of the Ramkos, by subsequent oral agreement of the parties, or without objection. Thus, all of the modifications were made part of the parties' Agreement. In addition, the trial court held that it would consider parole evidence in interpreting the contract and in supplementing its written terms.

The trial court then considered each element of SDG's claims. The trial court found that "a significant portion of the work accomplished by [SDG] was not contemplated by the terms of the contract." The trial court listed items that were not contemplated within the terms of the contract, as well as the cost of each upgrade or addition:

1. Brick low wall, construction cost of $600
2. Finials, construction cost of $1,362.73
3. Gutter guard, construction cost of $428
4. Shower glass window, construction cost of $125
5. Custom built-in extras, construction cost of $2,401.51

6.  The fire log upgrade, construction cost of $515.90
7.  Decorative concrete, construction cost of $3,200
8.  Additional electrical outlets for ironing board, hood fan, deep fryer, pot filler, and water softener, cost of $300[8]
9.  Brick selection, upgrade cost of $2,799.59
10.  Front door, upgrade cost of $1,023.32
11.  Intercom and related electronic systems, cost of $2,992.50

These upgrades or additions totaled $15,748.55; all were outside the scope of the fixed price in the contract. The trial court then reduced the damages awarded to SDG on these items to $4,000, based on the "general position of both parties initially that there was some opportunity for upgrades built into the contract," as well as other factors:

> [A]t least with regard to the electronic devices, the proof shows that although the Defendants did receive these items and the value of their home was thus increased to the extent that such additions enhance their home, they were induced to make these purchases only because of the insistence of the Plaintiff and the assurance of the Plaintiff that these items were well within the budgeted sum provided within the initial contract for construction of the home. . . . [W]ith regard to the brick and front door, the Plaintiff made the Defendants aware at the time of these selections that the choices were outside of the budgeted amount and the Defendants would have to cut corners elsewhere. Underlying all of these issues is the general position of both parties initially that there was some opportunity for upgrades built into the contract due to the feeling of both parties that there was an extra $20,000 in the contract. Considering all of these issues, we find that the Plaintiff should be entitled to recover a portion of these items which the Court finds should be limited to $4,000.

The trial court next addressed SDG's claim that it expended amounts over and above the $40,000 paid to the Ramkos for work the Ramkos had personally completed in the kitchen and relating to plumbing, flooring, and light fixtures. For these items, SDG claimed $15,999.68. Of this amount, the trial court awarded SDG $8,732.04, which included $4,210 for countertops, $575.39 for an upgraded sink, and $3,946.65 for light fixtures.

The trial court declined to grant SDG's claim for damages from rehanging light fixtures, expediting the Ramkos' move-in, relocating a water line, relocating the laundry piping and

---

[8]SDG requested $425 for this expense, but the trial court reduced the amount to $300 because the Ramkos testified that the work was at least partially done by Mr. Ramko.

a sink, the cost of a $100 hinge, and a painting surcharge for the use of thirteen different colors in the interior of the house. The trial court determined that all of these items were either contemplated within the original contract, necessitated by actions of SDG, or that SDG did not submit sufficient evidence to substantiate its claim on the item.

In addition, the trial court awarded SDG $3,830 for the building permits and fees necessary for construction, because the parties' Agreement plainly stated that such costs were to be borne by the Ramkos in addition to the fixed price of $320,000.

The trial court noted that landscaping and yard work was contemplated in the fixed price under the Agreement, but that this work was not done by SDG. The trial court found that the Ramkos did a portion of the landscaping, but that it was not completed in the manner contemplated by the contract. Consequently, the trial court awarded the Ramkos an offset of $3,575 for the landscaping work that was not accomplished as required under the Agreement.

Totaling these amounts and providing for the setoff, the trial court awarded SDG damages in the amount of $12,987.04 (4,000 + 8,732.04 + 3,830 - 3,575).

On September 9, 2010, the Ramkos filed a motion pursuant to Rule 59 of the Tennessee Rules of Civil Procedure, pointing out that the trial court had failed to dispose of their counterclaim in its final order. The trial court agreed, and directed the parties to submit proposed findings of fact and conclusions of law on the Ramkos' counterclaim. The trial court stated that, after it received the parties' proposals, it would issue findings of fact and conclusions of law in accordance with Tenn. R. Civ. P. 52.

Both parties filed proposed findings of fact and conclusions of law. On October 15, 2010, the trial court conducted a hearing on the Ramkos' Rule 59 motion.[9]

On April 11, 2011, the trial court entered findings of fact and conclusions of law, generally approving the proposed findings submitted by SDG and rejecting the proposed findings submitted by the Ramkos. Specifically, the trial court rejected the Ramkos' proposed findings that $20,000 in corrections remained undone on the house, that SDG breached express or implied warranties, that SDG engaged in deceptive acts or practices, that the Ramkos reasonably relied on Mr. Cheng's representations that he could construct the home for $320,000, that SDG violated the TCPA, or that SDG was liable for intentional or negligent misrepresentation. From this order, the Ramkos now appeal.

---

[9]A transcript of that hearing is not included in the appellate record.

**ISSUES ON APPEAL AND STANDARD OF REVIEW**

On appeal, the Ramkos argue that:

1.  SDG's claim is barred by the doctrine of judicial estoppel;
2.  A preponderance of the evidence supports the conclusion that SDG breached the parties' contract;
3.  SDG's misrepresentations constituted a violation of the TCPA;
4.  The Ramkos are entitled to recover under the common law theories of fraudulent and negligent misrepresentation.

On these bases, the Ramkos argue, the trial court's judgment should be reversed, SDG's complaint should be dismissed, and a judgment should be entered in their favor on their counterclaims. On cross-appeal, SDG argues that the trial court erred in reducing its recovery for work that was performed outside the contemplation of the Agreement. SDG contends that the trial court should have awarded it all of the amounts it expended that were not included in the original scope of the contract.

Because this was a bench trial, we review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *see Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The evidence preponderates against a trial court's finding of fact where the record supports an alternative finding with greater convincing evidence. *Mosely v. McCanless*, 207 S.W.3d 247, 251 (Tenn. Ct. App. 2006). "When credibility and weight to be given testimony are at issue, considerable deference must be afforded the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony." *Mitchell v. Fayetteville Pub. Utils.*, No. M2011-00410-SC-R3-WC, 2012 WL 1593122, at *4 (Tenn. May 8, 2012). Therefore, we will not overturn a factual finding that was based on a credibility determination absent clear and convincing evidence to the contrary. *Hughes v. Metro. Gov't of Nashville & Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). Issues of law are reviewed *de novo*, with no presumption of correctness. *Mitchell*, 2012 WL 1593122, at *4; *Union Carbide Corp.*, 854 S.W.2d at 91.

## ANALYSIS

### Judicial Estoppel

The Ramkos first argue that SDG is barred under the doctrine of judicial estoppel from asserting that any additional amounts are due from the Ramkos under the construction contract, because Mr. Cheng signed a sworn Affidavit of Completion and Lien Waiver in which he attested that no other amounts were due and owing from the Ramkos. The doctrine of judicial estoppel, they argue, prevents a litigant from taking an inconsistent legal position in a subsequent proceeding in order to prevent parties from playing "fast-and-loose" with the courts. *Cothern v. Scott*, 446 S.W.2d 533, 535-36 (Tenn. Ct. App. 1969) (quoting 31 C.J.S. Estoppel § 117 at 623); *see Hamilton v. Zimmerman*, 37 Tenn. (5 Sneed) 39 (1857); *see also Marcus v. Marcus*, 993 S.W.2d 596, 602 (Tenn. 1999). SDG points out, however, that the doctrine of judicial estoppel does not apply in this case, because the alleged prior inconsistent statements by Mr. Cheng were not executed in a judicial proceeding. Any other estoppel argument, SDG claims, was never raised as an affirmative defense in this case and, therefore, is waived.

We agree with SDG on this issue. Under the doctrine of judicial estoppel, a litigant is barred from taking a position contrary to an oath or sworn statement made in a previous judicial proceeding:

> [W]e take this opportunity to clarify that the doctrine of *judicial* estoppel is applicable only when a party has attempted to contradict by oath a sworn statement previously made. *See Allen v. Neal*, 217 Tenn. 181, 396 S.W.2d 344, 346 (1965) (noting that "[j]udicial estoppels arise from sworn statements made in the course of judicial proceedings, generally in a former litigation, and are based on public policy upholding the sanctity of an oath and not on prejudice to adverse party by reason thereof, as in the case of equitable estoppel").

*Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 315 (Tenn. 2009) (emphasis in original). Thus, because the alleged prior inconsistent statements by Mr. Cheng were not made in the course of judicial proceedings, the doctrine of judicial estoppel is not applicable.

### Preponderance of the Evidence on Breach of Contract

The Ramkos next argue that the evidence preponderates against the trial court's holding that they breached the Agreement by failing to pay for upgrades and additions that were not

-13-

contemplated within the $320,000 contract price. The Ramkos contend that this holding amounts to an inclusion of contractual terms to which they did not agree. They assert that the trial court's decision to award SDG the cost of some of these upgrades and additions was not based on contract principles, but was done simply to avoid a harsh result to SDG. The Ramkos further argue that the evidence at trial preponderated in favor of a finding that the upgrades and additions that were incorporated into the home were made at Mr. Cheng's suggestion, and they were made only because both parties operated on the premise that the project was under budget and the upgrades would not increase the cost of the home. Only when Mr. Cheng realized that he had mistakenly omitted his builder's fee from the original estimates did he assert that the Ramkos were responsible for the extra cost of upgrades and additions. Thus, because the Agreement provided that the fixed cost of the home was $320,000, and because the Ramkos paid that amount, they should owe no more to SDG.

In response, SDG argues that the evidence preponderates in favor of the trial court's decision, because the evidence showed that the Ramkos requested and agreed to pay for all of the upgrades and additions, either with money they had set aside or money they planned to obtain from the sale of their former home. Although none of the change orders were in writing, SDG claims, the trial court properly found that the parties waived the writing requirement and orally contracted for the upgrades and additions. SDG asserts that the Ramkos requested, acquiesced, and agreed to the many upgrades to the original scope of the work, and the Ramkos admitted that they knew that the upgrades and additions came at an increased cost. Therefore, SDG argues, the Ramkos breached the contract by failing to pay for the upgrades they received.

In its decision below, the trial court identified specific upgrades and/or additions that were not contemplated in the original Agreement. The trial court first found that the parties waived the contractual requirement that change orders be in writing, and found that the construction of these items "was accomplished either at the oral direction of the Defendants, by subsequent oral agreement of the parties, or without objection at variance with the plans presented and made a part of the original contract." It reduced the award of damages to SDG, however, because some of the upgrades, particularly with respect to the electronic devices, were induced by "the insistence of the Plaintiff and the assurance of the Plaintiff that these items were well within the budgeted sum provided within the initial contract for construction of the home." The trial court also recognized "the general position of both parties initially that there was some opportunity for upgrades built into the contract due to the feeling of both parties that there was an extra $20,000 in the contract." For these reasons, the trial court did not award SDG the entire amount of the upgrades and additions that were the subject of the parties' later oral agreement.

-14-

This Court has recognized that it is not uncommon for parties to a home construction contract to waive the requirement that change orders be reduced to writing:

> Including a written change order requirement in a construction contract is not uncommon. It promotes a more definite understanding between the parties and thus, helps to avoid potential controversies. . . . However, like other contractual provisions, they can be waived or abrogated by the parties.
>
> The waiver of a written change order requirement by an owner is not always required to be in writing but may be the result of the parties' conduct on the job. Thus, it is not uncommon for courts to find that an owner has waived a written notice requirement in cases where extra work has been ordered verbally by the owner or the extra work has been performed with the owner's knowledge and without its objection.

***Moore Constr. Co. v. Clarksville Dept. of Elec.***, 707 S.W.2d 1, 12-13 (Tenn. Ct. App. 1985) (citations and footnote omitted). When a change order is not reduced to writing, however, the terms of the parties' oral modification of the agreement depends on their oral communications.

Generally, a contractor does not have the right to compensation for every deviation from the original contract. 64 AM. JUR. PROOF OF FACTS 3d 471, § 1 (2001). The contractor may, however, be entitled to such compensation if he received sufficient authorization from the homeowner. In order to determine whether sufficient authorization was given, courts look to the facts of each situation on a case-by-case basis:

> To determine whether or not a contractor (or subcontractor in the case of a subcontract) is entitled to compensation for extra work, the courts perform a case-by-case evaluation of the particular circumstances presented, including the scope of work set forth in the contract and building specifications; the nature of the particular work claimed as "extra"; any stipulations in the contract regarding authorization for extra work; the effect of such stipulations on the right to recover compensation for the work alleged to be extra; the nature and extent of the alleged authorization for extra work; and the manner in which it was allegedly given to the contractor (or subcontractor).

***Id.***

The requirements for an enforceable modification of a contract are the same as the requirements for the enforceability of contracts generally. ***See Pelot v. Cakmes***, No.

E1999-02550-COA-R3-CV, 2000 WL 116046, at *5 (Tenn. Ct. App. Jan. 31, 2000). Any contract, oral or written, "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Retail Builders, Inc. v. Latham*, No. M2004-00771-COA-R3-CV, 2005 WL 3508013, at *9-10 (Tenn. Ct. App. Dec. 22, 2005) (quoting *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (citations and quotations omitted)); *Jones v. LeMoyne-Owen College*, 308 S.W.3d 894, 904 (Tenn. Ct. App. 2009). The terms must be sufficiently definite "so that a court can perceive what are the respective obligations of the parties." *Id.* (quoting *Doe*, 46 S.W.3d at 196). "In determining whether the parties mutually assented to the terms of a contract, 'courts must apply an objective standard based on the parties' manifestations.'" *Id.* at *10 (quoting *Staubach Retail Servs.-Southeast, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. Ct. App. 2005)).

The issue presented in the case *sub judice* is similar to that in *M.R. Stokes Co., Inc. v. Shular*, No. M2006-02659-COA-R3-CV, 2008 WL 544665, at *5-6 (Tenn. Ct. App. Feb. 26, 2008). In that case, the plaintiff contractor signed a written agreement to install sewer lines, water lines, and roads, and to perform certain site preparation for the defendant subdivision owner, all for a fixed price of $925,000. The contract stated that any work performed outside of the contract specifications that would entail extra costs had to be in writing and would "become an extra charge over and above the estimate." *M.R. Stokes Co.*, 2008 WL 544665, at *1. After the project was completed, the contractor filed a lawsuit against the subdivision owner claiming that the owner owed the contractor $97,676.25 for additional work it performed that was not specified in the original contract. The subdivision owner denied liability and asserted that there was no agreement to pay for any changes outside the scope of the parties' contract absent a written change order. *Id.* at *2. After a bench trial, the trial court rendered a judgment in favor of the contractor, concluding that the parties had waived the written change order requirement, and that the owner had breached the parties' oral agreement by not paying for the additional work.

On appeal in *M.R. Stokes Co.*, the owner argued that the evidence did not show that the parties had waived the writing requirement, or that he agreed to pay extra for the additional work. This Court affirmed the trial court's finding that the parties had, by their conduct, waived the written change order requirement. The appellate court concluded, however, that the evidence did not establish that the parties had reached an oral agreement regarding the owner's responsibility to pay for the additional work, holding that there had been no "meeting of the minds" with respect to the additional work:

> Still, the issue of whether the parties had a "meeting of the mind in mutual assent" regarding the price Contractor would be paid for the deviations from

the Contract remains. Based upon our careful analysis of the record, with respect to each of the matters for which Contractor seeks additional payment, we are compelled to the conclusion that there was not a meeting of the minds of the parties in mutual assent to the terms at issue. We find that the parties "have not expressly or implicitly agreed upon a reasonable price nor have they agreed upon a practicable method of determination of price." Accordingly, we hold that any agreement to "settle up" based upon "time and materials" at the end of the Project is unenforceable.

*Id.* at *6 (citations omitted in original). Thus, the court ***M.R. Stokes Co.*** held that the subdivision owner was not contractually obligated to pay the cost of the extra work performed by the contractor.

In the instant case, it is undisputed that the parties entered into a fixed price contract for the construction of the Ramkos' house for $320,000, inclusive of SDG's builder's fee. The issue is whether both parties orally assented to the modifications to the original Agreement, as alleged by SDG, such that the Ramkos are in breach of the oral agreement for failure to pay the cost of the agreed-upon upgrades and additions. The evidence on this issue was conflicting. Mr. Cheng claimed that, each time one of the elements of the home was upgraded or a new feature was added, he informed the Ramkos that they would be responsible for the additional cost. According to Mr. Cheng, the Ramkos told him that they intended to pay for these upgrades and additions from sources other than the construction loan. The Ramkos, on the other hand, testified that they agreed to the upgrades and additions based only on Mr. Cheng's assurance that they *would not* increase the total cost to the Ramkos. It is undisputed that throughout most of the construction period, both parties were under the mistaken impression that there was a substantial "cushion" built into the original Agreement for upgrades and extras.

From our review of the trial court's analysis and its damage award, it appears that the trial court did not address the real issue, namely, whether the parties had a "meeting of the minds" as to each upgrade or addition that was outside the scope of the original Agreement. As recognized in ***M.R. Stokes Co.***, an oral modification must be sufficiently definite in order to be enforceable. *See **M.R. Stokes Co.***, 2008 WL 544665, at *6. This determination is highly fact-specific and is based in large part on the trial court's assessment of the credibility of the witnesses.

The difficulty in this situation, however, is that the trial court credited the testimony of both parties to some extent, but it did not relate those credibility determinations to any specific upgrade or addition, *i.e.* the contract modification as to each upgrade or addition. While the trial court credited the Ramkos' assertion that Mr. Cheng assured them of a "cushion" in the

-17-

fixed price in the Agreement, it also credited Mr. Cheng's assertion that the Ramkos agreed to pay extra for the requested upgrades and additions. We do not know from the trial court's findings which upgrades and additions were understood by the parties to be covered by the "cushion" and which were understood to require the "extra" payment to which Mr. Cheng said the Ramkos agreed. Instead of making separate findings as to each upgrade or addition, the trial court simply made a $4,000 damage award not related to any specific upgrade. Likewise, the trial court awarded SDG a partial award on the $15,999.68 claimed in damages related to the extra kitchen expenses. Each of the upgrades and additions enumerated by the trial court occurred at a different point in time, and from the undisputed proof, each was the subject of a separate discussion between Mr. Cheng and Mr. Ramko or Mrs. Ramko. Thus each upgrade or addition was in essence a separate modification of the Agreement. Whether there was a meeting of the minds as to each such modification depends on the circumstances surrounding each specific upgrade or addition. Moreover, the trial court's assessment of the witnesses' credibility may differ from item to item. In sum, the trial court's findings are insufficient for us to review the proof as to each modification of the Agreement, *i.e.*, each upgrade or addition, to determine if the trial court's findings on a given modification and the damages awarded for the modification are supported by a preponderance of the evidence. Therefore, we have little choice but to reverse the trial court's award to SDG for the upgrades and additions and remand for the trial court to determine specifically whether the parties entered into an enforceable oral modification of the original Agreement as to each of the items for which SDG claims recovery.[10]

**Tennessee Consumer Protection Act**

The Ramkos also argue that the trial court erred in dismissing their TCPA claim. They contend that, even if Mr. Cheng did not intend to misrepresent to the Ramkos that he was under budget during construction, his negligent misrepresentation to that effect may serve as a basis for a TCPA violation. The Ramkos claim that the "uncontroverted evidence, in and of itself, supports a violation of the Act." They further argue that Mr. Cheng's misrepresentations, while perhaps innocent when made, became intentionally fraudulent once Mr. Cheng discovered that he omitted his builder's fee from his estimate and "adjusted" his estimates on cost to suggest that the Ramkos had exceeded their allowances. The Ramkos also argue that Mr. Cheng committed fraud when he signed the Affidavit of Completion

---

[10]We note that SDG also asserted in its complaint claims based on unjust enrichment and *quantum meruit*. To the extent that the trial court determines that the parties did not enter into an enforceable modification of the contract, it may consider these quasi-contractual theories as a basis for recovery by SDG. *See M.R. Stokes Co.*, 2008 WL 544665, at *6 (determining that, although there was no enforceable contract modification, the plaintiff was entitled to damages based on the equitable theories of unjust enrichment, quasi-contract, contracts implied in law, and *quantum meruit*, which "are essentially the same").

stating that no money was outstanding from the Ramkos in order to obtain the remaining construction loan funds from the lender. The Ramkos assert that the trial court did not make specific findings of fact on this issue, other than to deny their TCPA claims, and therefore contend that its decision to dismiss these claims are not entitled to any deference on appeal.

Initially, we point out that the trial court in fact did make factual findings that specifically pertained to the Ramkos' TCPA claim; the trial court adopted SDG's proposed findings of fact on this claim in their entirety.[11] In adopting those findings, the trial court found that the Ramkos' complaints about the quality of SDG's workmanship in construction were minor, that SDG complied with its warranty obligations to the Ramkos, that SDG did not act with fraudulent intent in its dealings with the Ramkos, and that the Ramkos were not damaged by any representations of SDG because the value of their home was enhanced by the upgrades. The trial court also found that the Ramkos "did not prove the counterclaim by a preponderance of the evidence." For this reason, we decline to adopt the Ramkos' argument that the trial court's decision on this issue is not subject to a Rule 13(d) standard of review. The TCPA makes it unlawful to represent that goods or services are of a particular standard if they are another, or to engage "in any other act or practice which is deceptive to the consumer or to any other person." The Ramkos correctly observe that a deceptive act need not be knowing or intentional to be the basis for a TCPA claim:

> The Tennessee Consumer Protection Act does not impose a single standard applicable to all cases for determining whether a particular act or practice is deceptive for the purpose of Tenn. Code Ann. § 47-18-104(b)(27). *Ganzevoort v. Russell*, 949 S.W.2d at 300. To be considered deceptive, an act is not necessarily required to be knowing or intentional. Negligent misrepresentations may be found to be violations of the Act. *Holladay v. Speed*, 208 S.W.3d 408, 416 (Tenn. Ct. App. 2005); *Tucker v. Sierra Builders*, 180 S.W.3d at 115; *Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9, 13 (Tenn. Ct. App. 1992); *see also* Jeff Mueller, New Home Construction Liability, Tenn. B.J., May 2007, at 18, 20. A deceptive act or practice is, in essence, "a material representation, practice or omission likely to mislead . . . reasonable consumer[s]" to their detriment. *Ganzevoort v. Russell*, 949 S.W.2d at 299 (quoting *Bisson v. Ward*, 160 Vt. 343, 628 A.2d 1256, 1261 (1993)).

*Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009).

---

[11] The trial court stated that it approved "the original 61 findings Proposed by the Plaintiffs," because there was no objection and they were supported by the trial court's original decision.

In the instant case, the trial court found that Mr. Cheng's representations to the Ramkos throughout their dealings was made without fraudulent intent. Giving appropriate deference to the trial court's credibility determinations, we hold that the evidence presented at trial preponderates in favor of this finding. Despite the omission of the builder's fee from the initial spreadsheets and Mr. Cheng's assurances of a "cushion," all of the necessary figures were included in the spreadsheet so that the spreadsheets were not "likely to mislead" the Ramkos. In addition, Mr. Cheng testified that the Ramkos were aware they were choosing items that were not contemplated in the original Agreement, and that they told Mr. Cheng they intended to pay extra for them. The trial court credited this testimony.[12] Under these circumstances, we must find that the evidence preponderates in favor of the trial court's decision that Mr. Cheng's conduct did not constitute "a material representation, practice or omission likely to mislead . . . reasonable consumer[s]" to their detriment. *Ganzevoort*, 949 S.W.2d at 299 (quoting *Bisson v. Ward*, 160 Vt. 343, 628 A.2d 1256, 1261 (1993)), *quoted in Fayne*, 301 S.W.3d at 177.

### Fraudulent and/or Negligent Misrepresentation

The Ramkos also argue that the trial court erred in dismissing their fraudulent and/or negligent misrepresentation claims. In order to establish this claim, the Ramkos were required to show that: (1) SDG made a representation of an existing or past fact, (2) the representation was false when made, (3) the representation was in regard to a material fact, (4) the false representation was made either knowingly or without belief in its truth or recklessly, (5) the Ramkos reasonably relied on the misrepresentation, and (6) the Ramkos suffered damages resulting therefrom. *See Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 371 (Tenn. Ct. App. 2006) (quoting *Metro. Gov't of Nashville and Davidson County v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)).

The trial court determined that the Ramkos were not damaged by any representations made by Mr. Cheng because they received the enhancement and value of the upgrades and additions to the house. On appeal, the Ramkos have not disputed this finding, nor have they identified evidence of any damage that they sustained from Mr. Cheng's representations. The result of Mr. Cheng's representations was that the Ramkos made additions and upgrades in the construction of their house, and they have received the benefit of those upgrades. There being no evidence to the contrary, we find that the evidence supports the trial court's

---

[12]As we have explained earlier in this Opinion, the trial court credited Mr. Cheng's testimony on this point, but it also found that Mr. Cheng told the Ramkos that there was a "cushion" in the fixed price in the Agreement. The trial court did not determine which items were understood to require such an "extra" payment. However, pertinent to the TCPA claim, it is apparent that the trial court did not consider Mr. Cheng's conduct to have been deceptive or "likely to mislead" the Ramkos.

finding on this point. Because the Ramkos have not established their damages, the sixth element of their claim, we affirm the trial court's dismissal of this claim.

## Other Issues

Any portion of the trial court's decision that was not challenged on appeal remains intact. All other issues raised by the parties and not specifically addressed herein are pretermitted by our decision.

## CONCLUSION

The decision of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion. Costs on appeal are to be taxed one-half to Appellants Wayne and Donna Ramko and their surety, and one-half to Appellee Signature Designs Group, LLC, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE